IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLIE ANN B.[1]                                          No. 1:18-cv-01427-HZ

                    Plaintiff,

         v.

COMMISSIONER OF SOCIAL                        OPINION & ORDER
SECURITY,

                    Defendant.

John E. Haapala
401 E. 10th Avenue, Suite 240
Eugene, Oregon 97401

         Attorney for Plaintiff

_____

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member. The record shows that in August 2016, Plaintiff changed her last name when she married and currently, she uses a last name beginning with the letter "S." Tr. 32-33. The case name in this Court's docket also uses that last name beginning with the letter "S." But, in their briefing, the parties have used a last name starting with the letter "B," the last name Plaintiff used before her marriage. Because of the parties' use and because Plaintiff's benefits application was made using the last name beginning with the letter "B," the Court uses it as well.

1 - OPINION & ORDER

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Renata Gowie
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2936

Joseph J. Langkamer
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

    Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff Kellie Ann B. brings this action seeking judicial review of the Commissioner's final decision to deny supplemental security income (SSI). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I affirm the Commissioner's decision.

## PROCEDURAL BACKGROUND

Plaintiff applied for SSI on September 22, 2014, alleging an onset date of November 1, 2013. Tr. 151-59. Her application was denied initially and on reconsideration. Tr. 62-75, 91-94 (Initial); Tr. 75-90, 98-100 (Recon.). On April 4, 2017, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 27-58. On June 28, 2017, the ALJ found Plaintiff not disabled. Tr. 10-26. The Appeals Council denied review. Tr. 1-6.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on having ulcerative colitis, a fractured back, seizures,

migraines, chronic pain, and one kidney. Tr. 168. At the time of the hearing, she was fifty years old. Tr. 151 (showing date of birth). She has a GED and has past relevant work experience as a fast food worker and a telemarketer. Tr. 21, 169.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if

not, the Commissioner proceeds to step four.  *Yucker*t, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform "past relevant work."  20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can perform past relevant work, the claimant

is not disabled.  If the claimant cannot perform past relevant work, the burden shifts to the

Commissioner.  In step five, the Commissioner must establish that the claimant can perform

other work.  *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If

the Commissioner meets his burden and proves that the claimant is able to perform other work

which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566,

416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity since her application date.  Tr. 15.  Next, at steps two and three, the ALJ determined that

Plaintiff has severe impairments of degenerative disc disease, migraines, and right knee patellar

chondromalacia, but that the impairments did not meet or equal, either singly or in combination,

a listed impairment.  Tr. 15-17.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as

defined in 20 C.F.R. § 416.967(c), with the following limitations: (1) she can occasionally

balance, stoop, crouch, kneel, crawl, and climb ladders, ropes, and scaffolds; (2) she can

frequently climb ramps and stairs and use foot pedals with her lower extremities; (3) she should

avoid hazards such as machinery and unprotected heights; and (4) she can understand, remember,

and carry out only short and simple instructions.  Tr. 17.  With this RFC, the ALJ determined that

Plaintiff is able to perform her past relevant work of telemarketer and fast food worker.  Tr. 21.

Thus, the ALJ determined at step four that Plaintiff is not disabled.  Tr. 21-22.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff alleges that the ALJ erred by finding her subjective limitations testimony not credible, by discounting the statements made by a lay witness, and by relying on vocational expert testimony which contradicts the Dictionary of Occupational Titles and the ALJ's own RFC.

/ / /

## I. Plaintiff Credibility

The ALJ is responsible for determining credibility. *See Vasquez*, 572 F.3d at 591. Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. *Carmickle v. Comm'r*, 533 F.3d 1155, 1160 (9th Cir. 2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons'"); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (ALJ engages in two-step analysis to determine credibility: First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged"; and second, if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give "specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain. *Id.*; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors

in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in *Molina*:

In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation. For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.] While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.] Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ applied the proper two-step inquiry. Tr. 17-18. She summarized Plaintiff's subjective limitations assertions. *Id.* She noted her assertions of debilitating migraine pain, radiating right knee pain, chronic spine pain, sleep disturbances, medication side effects, and a greatly reduced range of motion. Tr. 17. She also referred to her allegations that her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, remember instructions, and concentrate were impaired. *Id.; see also* Tr. 186-93 (stating she can sit for only a few minutes, can stand for only a few minutes, she is bedridden from ulcerative colitis symptoms and back pain, she sleeps only two to three hours per night because of pain, she has

trouble bending, she is limited in how frequently she can go outside because of pain, she can

walk for only five minutes, she can lift only five pounds, she can pay attention for only twenty

minutes. The ALJ also cited Plaintiff's testimony that she experienced up to twenty-two

migraines per month, with an average duration of five to eight hours per episode with symptoms

such as hand tremors, "tunnel-like" vision, and hearing limitations with dizziness. Tr. 18; *see*

*also* Tr. 37 (hearing testimony). The ALJ acknowledged that Plaintiff's medically determinable

impairments could reasonably be expected to produce her alleged symptoms. Tr. 18. But, she

discounted her statements concerning the intensity, persistence, and limiting effects of her

symptoms. *Id.* In support, she explained that Plaintiff's statements were "not entirely consistent

with the medical evidence." *Id.* The ALJ further suggested, in her discussion of the medical

evidence, that Plaintiff's conditions were treated fairly conservatively and responded well to

medication. Tr. 18-19. If supported by substantial evidence in the record, all of these reasons are

"clear and convincing" reasons which may discredit a claimant's subjective testimony. *Parra v.*

*Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("evidence of conservative treatment is sufficient to

discount a claimant's testimony regarding severity of an impairment"); *Warre v. Comm'r*, 439

F.3d 1001, 1006 (9th Cir. 2006) ("impairments that can be controlled effectively with medication

are not disabling for the purpose of determining eligibility for SSI benefits"); 20 C.F.R. §

416.929(c)(3)(iv) ("The type, dosage, effectiveness, and side effects of any medication you take

or have taken to alleviate your pain or other symptoms" are relevant to the evaluation of a

claimant's symptoms); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (although

"subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated

by objective medical evidence, the medical evidence is still a relevant factor in determining the

severity of the claimant's pain and its disabling effects."); *see also Carmickle*, 533 F.3d at 1161 (contradiction with the medical record is a sufficient basis for rejecting a claimant's subjective testimony).

The ALJ discussed the medical evidence relevant to Plaintiff's migraines, back problems, and knee pain. As to her migraines, she noted that Plaintiff sought emergency room services for bouts of headaches in May 2015, August 2015, and January 2016. Tr. 18. During the May 2015 visit, Plaintiff reported that her medications controlled her pain very well in the past, although she requested a "heavier duty medication" at discharge. *Id.* (citing Tr. 401, 405). During the August 2015 visit, she received a cranial CT scan and a spinal tap, neither of which revealed any abnormalities. *Id.* (citing Tr. 412). The treating physician observed that while she reported 10/10 headache pain, she was not "'in any distress and was observed laughing, smiling, and did not demonstrate any outward signs of pain[.]'" Tr. 18 (quoting Tr. 413). She returned to the emergency room the next day, reporting 10/10 headache pain without any report of visual changes, but stating that her legs "'gave out from under her.'" *Id.* (quoting Tr. 419). But, the physical examination revealed no physical abnormalities or restrictions. *Id.* Her condition improved with medications, she was ambulating well, and she received instructions to meet with her primary care physician and neurologist. *Id.* (citing Tr. 435). During her January 2016 emergency visit for migraine pain, medication quickly improved her condition and she was discharged with "a few Percocets." *Id.* (citing Tr. 480-81).

As to her back, the ALJ noted that Plaintiff testified that her severe lumbar spine pain caused bilateral hip and lower extremity dysfunction. Tr. 18. But, her MRI scans and physical examinations showed only mild to moderate impairment. Tr. 18-19 (citing Tr. 365-66 (January

2015 MRI identifying mild foraminal narrowing at the L5 level and mild narrowing of the thecal

sac at the L2-3 level, with no significant thecal sac or neural foraminal stenosis at any level; and

mild to moderate chronic depression deformity at the L3 level with mild compression deformity

of the T12 superior endplate); Tr. 375-79 (Feb. 2015 orthopedic examination in which physician

interpreted the January 2015 MRI to show no significant stenosis in the lumbar spine, noting

mild lumbar stenosis at the L2-3 level with an old compression fracture at L3, and

recommending a "medial branch block" injection with physical therapy)).  The ALJ noted that

the orthopedic examiner noted some range of motion limitations in Plaintiff's ability to extend

and flex her lower spine.  *Id.*  But, the ALJ found that the examination results, the MRI images,

and the fact that Plaintiff was referred only for physical therapy strongly suggested that the back

condition was not as limiting as Plaintiff described.  *Id.*

As to her knee, the ALJ observed that the record did not include a description of a

specific knee injury.  Tr. 19.  She noted that Plaintiff reported that she had experienced knee pain

since 1991, well before her application date.  *Id.*  In August 2015, she went to the emergency

room for right knee pain but the physical examination identified normal ranges of motion, and no

swelling, effusion, ecchymosis, deformity, or LCL laxity.  *Id.* (citing Tr. 404, 406).  Some MCL

laxity was found.  *Id.*  A right knee MRI showed a "small" joint effusion with no bone bruise or

internal derangement or tendon damage.  *Id.*  At a January 2017 orthopedic examination, during

which she had a physical examination and her MRI was reviewed, the orthopedist noted that her

condition was "'not a very straightforward problem' and wanted to review the lumbar spine MRI

scans to rule out a spinal cord pathology[.]"  *Id.* (quoting Tr. 670).  Although she previously had

a cortisone injection in her knee in June 2016, Tr. 684-88, the ALJ observed that the record did

not include follow-up treatment indicating a more intensive treatment regime.  Tr. 19.  The ALJ cited to several places in the record in which Plaintiff's physical examinations during office and emergency room visits described normal abilities without a description of debilitating pain or the inability to function.  *Id.*

In challenging the ALJ's decision, Plaintiff does not assert that the ALJ misrepresented the evidence the ALJ cited.  But, she contends that the ALJ overlooked evidence which she asserts is consistent with her disabling allegations and that contrary to the ALJ's finding, the medical evidence does not present "several contradictions" with her testimony.  Pl.'s Op. Brief 16-18, ECF 10.  As to her back pain, Plaintiff notes that the ALJ failed to mention MRIs of Plaintiff's thoracic spine in 2017 and her cervical spine in 2015.  Her September 2015 cervical spine MRI showed only mild to moderate findings.  Tr. 504.  The "stature and alignment of the cervical vertebral bodies" appeared "grossly normal."  *Id.*  There was moderate disc space narrowing at C3-4 with uncovertebral hypertrophy symmetrically.  *Id.*  The bone marrow signal of the vertebral bodies was normal and there was no disc protrusion at any cervical level.  *Id.*  There was a mild annular bulge at C6-7.  *Id.*  There was no syrinx or cord compression.  *Id.*  The imaging also showed moderate foraminal narrowing on the right at C6-7, secondary to uncovertebral hypertrophy.  *Id.*  Asymmetrical left-sided stenosis was seen at C4-5, secondary to uncovertebral hypertrophy.  *Id.*

The January 20, 2017 thoracic spine MRI revealed mild findings.  Tr. 694-95.  The MRI revealed mild "dextro-convex curvature of the thoracic spine," normal anatomic alignment of the thoracic spine, and a "Schmorl's node within the right superior endplate of T12."  Tr. 694. Otherwise, the "remaining visualized vertebral bodies" showed normal height and marrow signal.

*Id.* There were no acute compression fractures. *Id.* Mild disc space narrowing was observed at T8-9, T11-12, and T12-L1. *Id.* There was no cord compression. *Id.* At several levels, a mild disc osteophyte complex was seen but without significant center canal stenosis or neural foraminal narrowing. *Id.* Only the T9-T10 level showed a mild to moderate disc osteophyte. Tr. 695. The overall impression was of "[m]ild scattered degenerative disc disease" with no evidence of acute osseous injury. *Id.*

Plaintiff also notes that the ALJ failed to mention that in January 2017, Dr. Nicholas Sexton, M.D. noted a positive straight leg raise. Tr. 618.[2] In his January 4, 2017 chart note, Dr. Sexton noted that Plaintiff complained of knee pain. Tr. 618. Dr. Sexton performed a thorough examination of both of Plaintiff's knees. Tr. 620. He then noted that she had "[s]ome mild to moderate signs of straight leg raise on the right side with lumbar radicular-type symptoms." Tr. 620. He was concerned that her knee symptoms, which were not straightforward, might be related to her previous back injuries. *Id.* Thus, he ordered a lumbar spine MRI. *Id.* That MRI showed her longstanding compression fracture at L3 and mild degenerative disc disease from L2-L3 and L4-L5 without central spinal canal or neural foraminal stenosis at any level. *Id.*

The back pain evidence Plaintiff relies on does not establish that the ALJ erred. Instead, the evidence is similar to the evidence the ALJ already cited, all of which shows only mild to moderate objective findings. As with the other evidence, it is inconsistent with Plaintiff's assertions that she has extreme limitations in sitting, standing, moving, and lifting, or that her

---

[2]  Plaintiff states that both Dr. Sexton and Plaintiff's primary care provider Dr. Lindsey Metcalf made this assessment, citing the Administrative Record at pages 618 and 668. But, the second citation at page 668 is simply a duplicate of Dr. Sexton's January 4, 2017 chart note which notes that Dr. Metcalf is Plaintiff's primary care provider. There is no indication from the cited pages that both Dr. Sexton and Dr. Metcalf made the straight leg raising observation.

back pain causes her to lie in bed most of the time.

As to her knee pain, Plaintiff states that the ALJ failed to consider evidence from December 2016 which showed a patellar defect on the lateral aspect of the medial patellar facet. The record she cites is to Dr. Sexton's January 4, 2017 office visit. Tr. 620. The MRI, conducted on December 8, 2016, showed unremarkable medial and lateral menisci. Tr. 690. There was a focal moderate thickness chondral defect of the medial patellar facet near the median range. *Id.* There was no chondral flap or loose body. *Id.* Patellar alignment was normal. *Id.* The medial and lateral compartment cartilage was intact. *Id.* There was no acute fracture or dislocation and the bone marrow signal was within normal limits. *Id.* A trace joint effusion was present but the surrounding soft tissue structures were unremarkable. *Id.* There was a suggested MCL sprain. *Id.*

On December 12, 2016, Plaintiff saw Dr. Sandesh Pandit, M.D., to discuss the results of the knee MRI. Tr. 676. He performed a physical examination of Plaintiff's right knee and found no asymmetry, no fixed flexion deformity, and no obvious muscle wasting. Tr. 677. There was mild swelling over the medial aspect erythema. *Id.* He found no crepitus with knee flexion and extension, no swelling with milking, no increased temperature compared to the contralateral side, and no ecchymosis or bruising. *Id.* She was able to flex 130 degrees, although she had pain with terminate flexion. *Id.* She was positive for jointline tenderness over the medial joint line. *Id.* Dr. Pandit noted that the MRI suggested focal chondral defect over the medial patellar facet. Tr. 679. Plaintiff, who reported "not much benefit" from physical therapy, was "in a mindset to proceed with surgical intervention[.]" Tr. 679. Dr. Pandit referred her to Dr. Michael Krnacik, who saw her on December 22, 2016. Tr. 672-74.

Dr. Krnacik reviewed x-rays from March and June 2016, and the recent December 2016 MRI.  *Id.*  He also conducted a physical examination.  Tr. 673.  His examination revealed full extension and no coronal or sagittal plane deformity.  *Id.*  Her range of motion was 0 to 125 degrees bilaterally.  *Id.*  There was no obvious instability to varus and vaigus stress testing, anterior and posterior drawer, Lachman exam, or manual patellofemoral subluxation.  *Id.*  With manual lateral subluxation of the right patella, there was no more than 2 quadrants of motion with a solid endpoint.  *Id.*  With patellar ballotement, there was mild crepitus, described as painful.  *Id.*  Her hip exam was negative.  Her quadriceps strength was 4/5 with pain on testing bilaterally.  *Id.*

In discussing her prior imaging, Dr. Krnacik observed that the prior x-rays "demonstrate minimal bilateral tricompartmental degenerative change, which is symmetric without deformity or significant osteophyte formation."  Tr. 674.  There was good patellar tracking.  *Id.*  As to the recent MRI, he noted the small focal defect about the medial facet of the undersurface of the patella and a tiny effusion.  *Id.*  Based on the imaging and his physical examination, Dr. Krnacik concluded that while Plaintiff was "bothered by her knees significantly," it was unlikely that a "surgical lesion" was present.  *Id.*  Dr. Krnacik referred Plaintiff to Dr. Sexton and stated that if he did not note a surgical lesion, she should treat herself symptomatically.  *Id.*

Dr. Sexton, as noted above, saw Plaintiff on January 4, 2017.  Tr. 618.  He noted that knee pain was a "problem chronic throughout her life."  *Id.*  He performed a physical examination and reviewed her March 2016 x-rays and the December 2016 MRI.  Tr. 620.  The x-rays showed no degenerative changes, subluxations, or dislocations.  *Id.*  The MRI he described as relatively normal with the exception of a patellar defect on just the lateral aspect of the medial

patellar facet.  *Id.*  The patellar tracked normally.  *Id.*  Dr. Sexton noted that Plaintiff presented

with "not a very straightforward problem."  *Id.*  He thought that some of her symptoms might be

related to her previous lumbar spine injury and ordered an MRI of the lumbar spine for

evaluation.  *Id.*  In what appears to be her next visit with Umpqua Orthopedics, in February 2017,

Plaintiff had intact range of motion in her knees and 5/5 strength in her knee flexors.  Tr. 697.

The December 2016 MRI does not establish error in the ALJ's findings regarding

Plaintiff's knee.  While the MRI revealed a patellar defect on the lateral aspect of the medial

patellar facet, the contemporaneous physical examinations which had numerous normal findings,

including range of motion and strength assessments, were inconsistent with Plaintiff's allegations

that her knees gave out and severely limited her functioning.  Notably, the RFC in this case limits

Plaintiff to only occasional stooping, crouching, kneeling, etc.  Tr. 17.  She is limited to light

work, meaning a lifting restriction of twenty pounds.  *Id.*; 20 C.F.R. § 416.967(b).  The ALJ was

correct in his determination that Plaintiff's subjective limitation assertions are undermined by the

medical evidence and further, that the RFC accommodates any limitations supported by the

medical evidence.

Plaintiff makes no challenge to the ALJ's discussion of the evidence regarding her

migraines or ulcerative colitis.  She also does not challenge the ALJ's observations made

throughout his medical evidence discussion, that the treatment for some of her impairments was

largely conservative and that her impairments responded to medication.  Substantial evidence in

the record supports the ALJ's findings that Plaintiff's subjective limitations testimony was not

supported by the objective medical evidence.  The other reasons in support of the ALJ's negative

credibility finding remain unchallenged.  Thus, the ALJ did not err.

II. Lay Witness Testimony

The ALJ noted the third-party statement provided by Plaintiff's then-boyfriend, Michael Fuchs. Tr. 21. She "considered" his opinions "in terms of helping to understand some of the severity of the claimant's various symptoms over time." *Id.* She gave Fuchs's opinions "little weight," however, in assessing Plaintiff's current functional limitations because "of their high degree of subjectivity," and their lack of medically acceptable standards. *Id.*

"Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account." *Molina*, 674 F.3d at 1114. The ALJ must give reasons "germane to the witness" when discounting the testimony of lay witnesses. *Valentine*, 574 F.3d at 694.

Plaintiff argues that the reasons the ALJ gave for rejecting Fuchs's testimony are not germane. I agree. The ALJ's characterization of Fuchs's testimony as "subjective" is appropriately recognized to mean that because Fuchs had a relationship with Plaintiff, he was not objective in his observations. There is no other reasonable understanding of the ALJ's opinion. But, rejecting a lay witness opinion on that basis is improper. *See Ryan-Werry v. Colvin*, 641 F. App'x 684, 688 (9th Cir. 2015) (holding that the ALJ erred in rejecting the testimony of the claimant's spouse because he was an "interested party"; "We have repeatedly warned against discounting a lay witness' testimony simply because the witness is a claimant's spouse, and is therefore an 'interested party.'") (citing *Valentine*, 574 F.3d at 694 ("Such a broad rationale for rejection contradicts this Court's insistence that, regardless of whether they are interested parties, friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to his or her condition.") (internal quotation marks and brackets

omitted)).

Additionally, the fact that a lay witness provides testimony that "lacks" "medically acceptable standards" is also an improper basis for rejecting that testimony. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 & n.1 (9th Cir. 2009) (improper for ALJ to reject claimant's wife's testimony because witness was not knowledgeable in the medical or vocational fields); *Agatucci v. Colvin*, No. 6:13-cv-01626-MC, 2015 WL 1467209, at *10 (D. Or. Mar. 30, 2015) (lay witness's lack of medical training is not a germane reason to reject that witness's testimony), *aff'd sub nom. Agatucci v. Berryhill*, 721 F. App'x 614 (9th Cir. 2017); *Sims v. Astrue*, No. 3:10–CV–1040–HA, 2012 WL 364055, at *6 (D. Or. Feb. 2, 2012) (improper to reject lay witness opinion because witness lacked expertise).

Nonetheless, I agree with Defendant that the error is harmless. *Molina* holds that if an ALJ errs in the treatment of lay witness testimony, the error may be harmless if the same evidence the ALJ referred to in discrediting a plaintiff's claims also discredits the lay witness's evidence. *Molina*, 674 F.3d at 1117-22. Fuchs's opinions largely overlapped Plaintiff's subjective limitations assertions. Like Plaintiff, he asserted that she spent a lot of time in bed, had trouble bending, had trouble standing for long periods of time, could lift only five pounds, could walk between five and ten minutes before needing to rest, could stand for five to ten minutes before needing to rest, was limited to being inside, and she could sit for only ten minutes. Tr. 178-83. Because Fuchs's testimony is duplicative of Plaintiff's testimony which the ALJ rejected without error, the ALJ's error in her treatment of Fuchs's testimony is harmless.

III. Vocational Expert Testimony & Past Relevant Work

Relying on the testimony of the vocational expert (VE), the ALJ found that Plaintiff could

perform her past jobs of telemarketer and fast food worker. Tr. 21-22. Plaintiff argues that both

of these jobs are inconsistent with the RFC's limitation to "short and simple instructions" because

according to the Dictionary of Occupational Titles (DOT), the telemarketer position requires

Level Three Reasoning and the fast food worker requires Level Two Reasoning. Plaintiff

contends that the discrepancy between the DOT and VE testimony is unexplained and thus, by

relying on this VE testimony, the ALJ erred.

The ALJ is required to reconcile any conflict between VE testimony and the DOT.

*Massachi v. Astrue*, 486 F.3d 1149, 1153-54 (9th Cir. 2007). The ALJ must ask the expert to

explain any conflict and then "determine whether the [VE's] explanation for the conflict is

reasonable" before relying on the expert's opinion in the disability determination. *Id.* During the

hearing, the VE, in response to a hypothetical presented by the ALJ, identified telemarketer and

fast food worker as jobs that such a person could perform. Tr. 52-53. He stated that his

testimony was consistent with the DOT. Tr. 53. However, he then clarified that because the

telemarketing position was a semi-skilled job, a person as described in that hypothetical could

not, in fact, perform the telemarketer job. Tr. 54.

In responding to Plaintiff's argument, Defendant concedes that the ALJ improperly relied

on the telemarketing position. Thus, I confine my discussion to the fast food worker position.

Plaintiff argues that Level Two Reasoning jobs, which require a person to "apply commonsense

understanding to carry out detailed but uninvolved written or oral instructions," U.S. Dept. of

Labor, *Dictionary of Occupational Titles*, app. C, 1991 WL 688702 (4th ed. 1991), are

inconsistent with the limitation to "short and simple instructions." Plaintiff acknowledges that

both Ninth Circuit cases and others from this Court have held that the ability to perform "simple,

routine tasks" is consistent with Level Two Reasoning. Pl.'s Op. Brief 12-13 (citing cases).

Plaintiff argues, however, that here, the restriction to performing "short and simple" instructions distinguishes this case from those addressing the "simple, routine tasks" limitation.

I disagree. I have previously rejected the same argument. In a 2015 case, I concluded that the ALJ's limitations to performing "simple, routine tasks," *and* to following "simple, short instructions" was consistent with Level Two Reasoning jobs. *Barnes v. Colvin*, No. 6:14-cv-01906-HZ, 2015 WL 8160669, at *4 (D. Or. Dec. 7, 2015). There, and in subsequent cases, I have explained that

> In the [DOT] definition, the word "detailed" is modified with the words "but uninvolved." The dictionary meaning of "involved" is "complicated[.]" *Webster's New Int'l Dictionary* 1191 (3d ed. 2002). Furthermore, the definition of "complicated" is "not simple[.]" *Id.* at 465. Thus, "uninvolved" means "simple[.]" The modifier "but uninvolved" must be considered when interpreting the definition of Level 2 reasoning. *See e.g., Abrew v. Astrue*, 303 Fed. Appx. 567, 569–70 (9th Cir. 2008) (emphasized the phrase "but uninvolved" to affirm the ALJ's finding that the plaintiff could perform jobs with Level 2 reasoning, despite a limitation to simple tasks). Considering the entire phrase, "detailed but uninvolved," this Court finds that while the instructions may be detailed, they may also be simple. A task that includes "detailed, but uninvolved" instructions may consist of a number of steps, none of which are complex. Without the express limitation to "one or two" steps or instructions, there is no limitation to Level 1. *Therefore, a plaintiff who is limited to "short, simple instructions" is capable of performing a job requiring Level 2 reasoning.*

*Id.* (emphasis added; internal quotation marks and brackets omitted); *see also Cortez v. Comm'r*, No. 6:17-cv-00194-HZ, 2018 WL 1173423, at *4 (D. Or. Mar. 3, 2018) (holding that jobs with Level Two Reasoning were consistent with the RFC's simple instruction limitation).

*Barnes* is on point and forecloses Plaintiff's argument. Here, the ALJ's limitation to "short and simple instructions" is not inconsistent with the fast food worker position requiring Level Two Reasoning.

19 - OPINION & ORDER

Plaintiff makes two other arguments in support of her contention that the ALJ erred in identifying the fast food worker job as one she is capable of performing. First, she argues that the job requires constant reaching. Second, she contends that it requires lifting of twenty-five pounds. She argues that evidence regarding her neck and shoulder impairments shows that she cannot perform these aspects of the job. An ALJ does not err, however, by excluding limitations from properly discounted medical evidence or subjective complaints that were discredited. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (in formulating the RFC, ALJ appropriately considered those limitations for which there was record support and which did not depend on the claimant's subjective complaints); *Batson v. Comm'r*, 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate evidence from the opinions of treating physicians which was permissibly discounted or the claimant's own testimony which was found not credible, into the RFC). Here, Plaintiff testified she could not lift more than five or ten pounds. But, because the ALJ properly found this testimony not credible, it was not error to exclude it from the RFC or to determine that Plaintiff could perform a job requiring her to lift more than that weight. Additionally, Plaintiff erroneously states that the fast food worker job requires lifting up to twenty-five pounds. In fact, the position requires the ability to perform light work with a maximum exertion of twenty pounds occasionally. DOT 311.472-010, *available at* 1991 WL 672682. Thus, the job is consistent with the RFC.

As to the reaching limitation, there are no medical opinions containing a restriction on Plaintiff's ability to reach. And, discussed above, the objective medical evidence in the record indicates that Plaintiff's spinal impairments are moderately severe at most. Thus, the ALJ did not err in failing to include a reaching restriction in the RFC and in finding that Plaintiff can perform

this job.

Finally, there is no error in relying on only one of a claimant's past jobs at step four to determine that a claimant is not disabled. 20 C.F.R. § 416.920(f); *see also Lind v. Astrue*, 370 F. App'x 814, 817 (9th Cir. 2010) ("Any error by the ALJ in considering jobs that did not qualify as past relevant work was harmless because . . . and the ability to perform one of her past jobs is sufficient to meet the standard"). Thus, any error by the ALJ in relying on the telemarketer position is harmless.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _____ day of _____, 2019

_____
Marco A. Hernandez
United States District Judge